**MAINE YANKEE ATOMIC POWER COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 79–1311.

United States Court of Appeals, First Circuit.

Argued Dec. 4, 1979.

Decided May 16, 1980.

Lawrence M. Kearns, Boston, Mass., with whom Ellen C. Kearns and Morgan, Brown, Kearns & Joy, Boston, Mass., were on brief, for petitioner.

Robert I. Tendrich, Atty., Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Howard E. Perlstein, Atty., Washington, D. C., were on brief, for respondent.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Maine Yankee Atomic Power Company (the "Company") petitions to review and set aside an order of the National Labor Relations Board, and the Board cross-applies for enforcement of its own order,[1] pursuant to sections 10(e) and (f) of the National Labor Relations Act (the "Act"). The sole issue is

---

1. The Board's decision and order, issued July 9, 1979, is reported at 243 NLRB 52. It is based in part upon findings made in a representation proceeding reported at 239 NLRB 161.

whether certain company employees known as Shift Operating Supervisors (SOS's), who are in charge of the control room, the nerve center of the company's nuclear power plant in Wiscasset, Maine, are, as the Company contends, "supervisors" within section 2(11) of the Act and therefore exempt from inclusion in a bargaining unit consisting of the Company's production and maintenance employees. The Board holds they are not supervisors.

## I.

The Company's nuclear facility in Wiscasset commenced operations in 1972. In the same year, the Board first certified a bargaining unit of production and maintenance workers at the plant. Representing the unit, then as now, was the Utility Workers Union of America, AFL–CIO (the "Union"). As constituted in 1972, the unit included all "probationary and permanent hourly operating and maintenance employees . .," but it specifically excluded "office clerical employees, professional employees, guards, *supervisory control room operators* and supervisors as defined in the Act." (Emphasis supplied.) The position presently in issue— *i. e.,* shift operating supervisor, or in shorthand, "SOS"—is essentially the same as the excluded position then called "supervisory control room operator." [2]

On April 18, 1978, the Union petitioned the Board for an election to expand the production and maintenance unit so as to include SOS's as well as a number of other categories of professional and technical employees. There followed, in May 1978, several days of hearings before a Hearing Officer during which evidence was received on the nature of the various positions sought to be included in the expanded unit. The Company insisted that the SOS's were supervisors, hence exempt from any unit, and were, in any event, professional employees.[3] On August 7, 1978, the Acting Director of the First Region issued his Decision and Direction of Elections in which, *inter alia,* he ruled that SOS's were not supervisory employees, and, moreover, that they failed to met the Act's strict statutory requirements for professional employees. 239 NLRB 161. *See* note 3, *supra.* The Company appealed the denial of supervisory status to the Board, which granted review and ultimately affirmed the Acting Regional Director's determination that the SOS's were not supervisors, and should be included in the production and maintenance unit. 243 NLRB 52. Meanwhile, the election had taken place subject to impoundment of the SOS's ballots. After the Board affirmed Region 1, the impounded ballots were counted, and it was confirmed that a majority of the votes from the entire unit favored the Union. In order to secure judicial review of the Board's inclusion of SOS's in the unit, the Company refused to bargain with the Union; this led to an unfair labor practice charge and a Board decision and order holding the Company guilty of violation of section 8(a)(5) and (1) of the Act. *See* note 1, *supra.* The Board seeks our enforcement of

---

**2.** The reason for excluding the position in 1972 is disputed. The Company insists, in keeping with testimony of its plant manager, that reliance was placed on a decision issued in 1967 by the Board's Acting Regional Director in Boston in the case of *Connecticut Yankee Atomic Power Company and International Brotherhood of Electrical Workers, AFL–CIO,* (Case No. 1-*UC*-27). Union counsel have questioned this; they point out there is no evidence as to precisely why the union was willing to exclude the position from the originally stipulated unit. The *Connecticut Yankee* decision, which never reached the Board level, had upheld Connecticut Yankee's contention that "supervisory control operators," whose duties and powers approximated those of the position here in issue, were supervisors. In his "Decision and Direction of Elections" in the instant proceedings, the current Acting Regional Director states simply that the reason supervisory control room operators were excluded from the bargaining unit in 1972 "is not evident from the record."

**3.** As "professional employees" within section 2(12) of the Act, 29 U.S.C. § 152(12), they would—unlike supervisors—be entitled to join in collective bargaining · under the Act, but could not be forced to join the production and maintenance unit. Those Company employees found to be "professional" employees in the 1978 proceedings eventually voted against participation in that unit. The Company is not here pursuing its claim that SOS's are professional employees.

that order, while the Company asks us to set it aside.

## II.  *Facts*

The decisions of the Acting Regional Director and the Board are based on a transcript of hearings in June of 1978 before Hearing Officer Kevin J. Murray, which involved a host of other jobs besides the six SOS positions here in dispute. On the SOS issue, the Company called as the chief witnesses its plant manager, assistant plant manager, operations department head, and one of the SOS's. The Union called two other SOS's. Regarding the main features of the position, we find little or no significant disagreement between witnesses. Our summary of the facts is thus based almost entirely on undisputed testimony. Where the facts admit of differing interpretations, we shall so indicate.

### a.  *The Plant*

Maine Yankee's generating system is a pressurized water reactor that differs from that used at a conventional coal or oil-fired generating plant in the significant respect that heat for the boiler is produced by nuclear fission. The electricity is thereafter generated in the normal manner by means of steam-powered turbines. We take judi-

cial notice that a nuclear reactor, because of the enormous forces involved and a possibility of radioactive contamination, entails a potential for harm to property[4] and life in event of accident, of an order altogether different from that of a conventional power plant. The "gravity of the resulting injury" that would occur in the almost unthinkable event of a serious accident requires the owner of a nuclear facility, acting through its employees, to exercise extraordinary vigilance at all times. *Cf. United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947) (L. Hand, C. J.).[5]

### b.  *The Control Room and Its Functions*

The principal parts of the Maine Yankee plant—the reactor, boiler, cooling systems, etc.—are spread out over considerable ground in six main buildings, with the entire complex being surrounded by security fences and gates. Made up of hundreds of thousands of individual components, the plant machinery is organized into some 60 or 70 "systems," bearing descriptive names such as the service water system, let down system, charging system, safety injection system, reactor cooling system, and so on.[6] Each system is separately controllable, in that it can be "placed in service" or "taken

---

**4.** The Maine Yankee Wiscasset facility cost one-quarter billion dollars to construct. An accident resulting in damage to, or long-term shutdown of, the plant could obviously have enormous financial ramifications for the Company and its investors. *See Report of the President's Commission on the Accident at Three Mile Island*, October 1979, Washington, D. C., p. 13 (estimating costs from that accident to range from $1 to $2 billion). The scale of the employer's potential exposure to loss and liability in event of accident has some bearing on the extent of the responsibility assumed by the employees in question, and the reasonableness of the Company's insistence that such employees are, and should be, supervisory, i. e., exclusively identified with the interests of the employer. *Cf. NLRB v. Yeshiva University*, —— U.S. ——, ——, 100 S.Ct. 856, 862, 63 L.Ed.2d 115 (1980).

**5.** As the Company points out in its brief, the Three Mile Island accident in Pennsylvania did not occur until after this hearing. Perhaps reflecting the euphoria of an earlier period, Mr. Paine, the head of the operations department, when explaining how the plant worked, termed

it, "basically the same as a conventional power plant," and the Hearing Officer felt it unnecessary to take a view of the plant and its control room, saying, "I've been through a power plant before."

**6.** Systems are divided, according to testimony, into "primary side" and "secondary side" systems, the former relating to "the reactor, cooling and electrical" systems, and the latter to the turbine and water-treatment plant areas. While basic controls for both "sides" are located in the control room, under constant direct supervision of an SOS and an assisting control room operator (CRO), two auxiliary operators (AO's) are also constantly on duty out in the plant area, and are split between the two "sides," one being responsible for primary side equipment, the other for secondary side equipment. As hereinafter described, the AO's are in telephonic communication with the control room and receive directions from the control room when it is necessary for them to operate any of the outside controls.

out of service" by controls located in the plant's single central control room; to accomplish this, however, actions taken in the control room must often be supplemented by the manipulation of other controls—sometimes called auxiliary controls—associated with particular pieces of machinery and located elsewhere around the plant in one of the six buildings. Thus, besides the personnel whose duty station is the control room, there are other personnel, called Auxiliary Operators (AO's), whose function it is to manipulate the auxiliary controls out in the plant upon directions from, and in coordination with, the actions being taken in the control room. *See* note 6, *supra.*

A number of the systems and certain components, such as, for example, pumps, are redundant, *i. e.,* back-ups, capable of being switched in to take over for a similar system or component that has been temporarily removed from service because of a malfunction, or perhaps for scheduled maintenance. Thus a defective pump or cooling system can be taken out of service, and a back-up placed in service in its stead.

Besides regular operations systems, there are also systems maintained solely for emergency use such as the safety injunction system. If needed during an emergency, this system would be deployed automatically or manually to provide additional cooling to the reactor. The operators must see that it is maintained in a ready state, checking, for example, that the right amount of nitrogen gas is at all times present.

The control room was aptly described by the Acting Regional Director as "the plant nerve or safe-guard control center." From here the status of all ongoing systems is continually monitored on a vast array of electronic monitoring and sensing devices, viewing screens, alarm and trouble indicators, gauges, etc., which cover its walls. The myriad instruments show temperatures, pressures, flow levels and so on; and control room personnel are charged under federal and Company rules with maintaining continuous records and logs based on this data, and recording all significant events including any changeovers in the

systems and components in use. When one control room shift goes off duty and another takes its place, the log is passed to the incoming shift much as a ship's log is passed from watch to watch while at sea.

Should a malfunction occur in any of the plant equipment, wherever located, the control room instruments will so reflect and alarms will soon sound or flash in the control room. Serious malfunctions will cause the plant automatically to "trip," *i. e.,* cease generating electricity. Such an event has occurred, according to the operations department head, perhaps three times a year, and is costly to the Company as well as potentially embarrassing, since it may reflect some oversight in maintenance or in proper procedures. Prior to the automatic trip point being reached, therefore, it is hoped that those on duty in the control room will have noted the problem and, in the words of the operations department head, Mr. Paine, "made some kind of decision" so as to forestall the trip. Although many of the systems and safety devices are automatic, components can be operated manually from the control room by personnel there, if required, and according to Mr. Paine, manual operation has occurred at one time or another with respect to all the systems. Should, therefore, a rise in temperature, or a decrease in flow or pressure be noted, analysis is immediately undertaken to identify the problem; should it be ascertained that, for example, a cooler is plugged or a pump bearing overheated, a decision may then be in order to take the malfunctioning system temporarily out of service, and place in service, in its stead, a standby system maintained for such contingencies. Alternatively, some corrective action may be available that will leave the defective system still in service; for example, it may be possible to cool the overheated pump by turning on a cooling fan. All these actions must be taken either from the control room itself or by auxiliary operators (AO's) in the plant acting under directions from the control room, or by people in both places acting in concert. Procedures to deal with at least many of the potential malfunctions are provided for in detailed writ-

ten instructions maintained in the control room. However, the operations department head testified that while many systems were covered by the written emergency procedures, many were not, and that judgment was required to handle the various contingencies.

Emergencies are not, fortunately, everyday occurrences. Operators are usually called upon to put systems and components in and out of service in order to permit a scheduled repair or for testing, or pursuant to some operational routine. It was testified, for instance, that equipment is routinely "swapped over to gassifiers" every Sunday evening on a rotating basis. Whenever a system is scheduled for testing or maintenance, it is the duty of control room and auxiliary operator personnel to do what is required to shut off certain components and start up others. Some such operations can only be accomplished by the coordinated actions of two or three operators located both in the control room and out in the plant. Other actions are accomplished more simply—perhaps by a single auxiliary operator upon directions from the control room.

c. *Plant Organization*

Except during refueling or in the event of shutdowns, the plant operates continuously. To oversee its operation, and assure the safe functioning of all systems day and night, the Company provides three eight-hour operating shifts around the clock, viz., 8:00 a. m.–4:00 p. m.; 4:00 p. m.–midnight; midnight–8:00 a. m. On each shift there are five individuals: one plant shift superintendent; one shift operating supervisor (SOS) (the employee whose supervisory status is at issue in this case); one control room operator (CRO); and two auxiliary operators (AO's). So that these shifts can be fully manned at all times, the Company employs a total of six plant shift superintendents, six SOS's, and some fifteen CRO's and AO's. These people—together with

their chief, who is entitled the operations department head—comprise the entire operations department of Maine Yankee. There are, additionally, six other departments at the Company: plant engineering—quality assurance; administration; instrumentation and controls; maintenance; chemistry and health physics; and reactor and computer. While the personnel in these latter departments ordinarily work during normal daytime hours, members of the operations department, other than the head, are rotated around the various shifts.[7]

A given five-man operations department shift may be on duty on a so-called back shift— i.e., a shift at night or on a holiday, when no other personnel except security watchmen are at the plant. Another shift may be on duty during working hours when there is a full complement of executives and other employees on the premises. Regular maintenance and repairs are most likely to occur during working hours when repair and maintenance personnel are on duty. During back shifts, when higher-ranking officials are absent, the plant shift superintendent of the particular shift takes charge not only of his five-member operations crew but of the entire nuclear plant. Security guards, contract personnel, any overtime maintenance men, and others then on special duty, if any, report to him at these times.

d. *Duties of Members of Operations Shift*

To portray the responsibilities of the SOS, who is the second ranking member of any given operations shift, it is necessary to do so in context of the interrelated functions of all five shift members.

The head of each shift is the plant shift superintendent who, as already indicated, is conceded to be a supervisor for purposes of the National Labor Relations Act. The Company's job chart issued early in 1978

---

**7.** The operations department head ordinarily works regular daytime hours, as do certain operations personnel assigned to the "spare shift." When the plant shuts down for refueling once every 12 to 14 months, all Company personnel work on a shift basis to accomplish the refueling as rapidly as possible, but only the operations department people regularly work on a shift basis at other times.

shows the SOS as reporting directly to him; it goes on to show the CRO (control room operator) and two AO's (auxiliary operators) as reporting directly to the SOS. Security, contract and other non-operations plant personnel are shown as reporting to the plant shift superintendent on back shifts, weekends and holidays. An accompanying job description makes it one of the duties of an SOS to, "Inform the Plant Shift Superintendent of an abnormal condition or change to [sic] plant status"; and the evidence is clear that the SOS is in fact under such a continuing duty to report abnormalities to the plant shift superintendent (although not necessarily to defer acting himself pending such notification, see infra).

The office of the plant shift superintendent is adjacent to the control room, but entirely separate from it. About half the time of the plant shift superintendent is spent in the other buildings or in other areas of the plant, away from the control room and away from the superintendent's own office. Another 35% or 40% of his time is spent in his office. The remaining 10% or 15% of his time is spent in the control room. He is regularly available to the control room personnel by a telephone call system. However, the plant shift superintendent does not follow a fixed routine when visiting other parts of the plant, and some, usually brief, period of time may elapse before the control room is able to establish contact with him. Moreover, some further period of time may be required before he can come to the control room—assuming his presence is not more urgently required elsewhere.

The SOS is in charge of the control room, and is required to be in the control room at all times unless relieved; the control room is for all practical purposes his only duty station. The CRO is also stationed in the control room. The two men occupy similar desks there and work closely together. Prior to 1978, when an SOS was called a super-

visory control room operator, the two men divided the routine duty of monitoring the gauges on the control panel, although the supervisory control room operator was the one in charge. Since the new job title and description, the CRO has been made responsible for monitoring and routine logging operations. The SOS may and does assist, however, in the sense of doing something himself rather than asking the CRO to do it, if he feels the CRO is overloaded. This kind of "assistance" consumes approximately 30% of an SOS's time. Responsibility for maintaining the master log, called the plant operations log (as opposed to other more routine surveillance log sheets kept by the CRO), now rests with the SOS; formerly the shift superintendent was responsible to maintain this log.

As previously indicated the control room panel contains numerous buttons, switches and valves which control the 60–70 operating systems constituting the nuclear generating plant. By operating these, the SOS and the CRO can start and stop each system. Indeed, the SOS can, and is authorized on his own initiative to, shut down the reactor itself if he determines that safety so requires. While the major controls are in the control room, certain other controls necessary to switch equipment in and out of service are located at points around the plant—often in proximity to the particular component that is to be affected. The two AO's, one responsible for "primary" side equipment and the other for "secondary" side equipment, see note 6, supra, are stationed out in the plant [8] and are charged with operating these auxiliary controls upon directions received from the control room over a telephone call system. An AO's manipulation of such controls will often have to be coordinated with actions being taken in the control room: viz., the AO might be directed by an SOS to disconnect an overheated pump and "line up" a stand-by pump to take its place; the SOS

8. According to the head of the operations department, the AO's have hourly readings to take, and rounds to make in order to monitor all the various pieces of equipment in their respective plant areas and ensure that it is operating correctly. This equipment is "fairly well spread out" in the six different buildings.

and CRO in the control room will turn the respective pumps on or off in phase with the AO's actions as reported to them over the telephone.

Of all the classifications in the operations department, the AO is the lowest grade level. Entering employees become AO's after ten weeks' training (usually such new personnel will already have had at least three or four years experience if their background was at a conventional utility or else they will be Maine Maritime Academy graduates or former members of the Navy nuclear program). As the Acting Regional Director found,

> "Employees normally progress from AO to CRO and then on to SOS or higher positions. Of the present complement of SOS's, most, if not all, were formerly CRO's with the Employer. As in the case of the Employer's professional, technical and plant clericals, both the plant shift superintendents and SOS's are salaried, whereas the CRO's and AO's are hourly rated. On the average, an SOS earns about 10% less than a plant shift superintendent and can earn about 17% more than a CRO."

Because the SOS must normally remain in the control room, face to face contact between the SOS and AO's is limited. However, there is considerable contact by telephone; and the SOS can usually determine if the AO has performed correctly his assigned tasks by indications showing up in the control room, e. g., if a component is not properly disconnected or put in service, this fact will show up on the control room instruments.

In taking systems and components in and out of service, the AO takes directions from the SOS. While the CRO may also sometimes transmit directions on the telephone to an AO, the SOS is in charge, and all such orders from the CRO are therefore necessarily given with the tacit or explicit approval of the SOS. While AO's may take routine orders from CRO's, one SOS testified that he has had to intervene to back up his CRO when an AO refused to do what the CRO had requested. There is no evidence that, ordinarily, the plant shift superintendent rather than the SOS will give direct orders to the CRO or AO, concerning the placing of systems in service, or the starting up of systems, these being matters for the control room to handle. There is evidence, however, that the plant shift superintendent, in touring the plant, will often meet up with the AO's, and may himself assign them other tasks—for example, tasks relative to repairs or equipment checks—and oversee their execution. One SOS, however, testified that separate assignments to an AO by the plant shift superintendent were relatively infrequent.

e. *Authority of SOS to Direct Actions of CRO and AO's*

Testimony was furnished by four witnesses—two called by the Company and two called by the Union—concerning the authority of the SOS to direct other shift personnel. As this was largely ignored by the Board, we summarize it briefly.[9]

The operations department head, Mr. Paine, a Company witness, indicated that an SOS is "responsible for the entire electric power output continuing to be ongoing" —meaning, Paine said, "should something go wrong, he's the one that would have to answer to why." According to Paine, the SOS has full authority to take any system in or out of service and has the authority to

---

**9.** The Acting Regional Director did find that the SOS "has the direct primary responsibility for normal control room operations," and that between the SOS and CRO, the SOS "has ultimate authority with respect to any operational decisions they are authorized to make without prior clearance." The Board itself made no contrary findings, but nonetheless dismissed whatever directions the SOS might impart to the CRO as "simply those of a more skilled employee advising one less skilled," and de-scribed the function of the SOS and CRO as so interchangeable and so routine that little "direction in the employment sense" was involved. Beyond saying this, the Board simply did not come to grips with the uncontroverted and unanimous testimony of all witnesses, Union as well as Company, that the SOS had ultimate authority in the control room—and over the AO's at least insofar as putting machinery in and out of service was concerned.

run the shift. He went on to testify that while an experienced CRO would himself "be aware of most things . . . the ultimate responsibility is upon the shift operating supervisor to say that this system should be taken out of service or placed in service or started up. . . ." The CRO may occasionally direct the AO's but only at the request of the SOS. Paine testified an SOS could reprimand a subordinate at any time, but that, "as far as suspensions go, it's a recommendation to myself."

SOS Hanson, a witness called by the Union, testified that as far as operations in the control room were concerned, it was the SOS's responsibility to make the decision. He did not see himself as officially disciplining a CRO, but would tell him to "shape up" if he "is not doing things the way I think he should do on the board." Hanson said he considered himself to be responsible for the performance of employees over whom he had control, primarily the CRO, if they took too much time in the bathroom or too long on a coffee break or that type of thing. He could tell the AO's to get out of the control room if they were spending too much time there, but, as for responsibility for their performance out in the plant, he commented simply, "I don't know." SOS Hanson (whose regular assignment was to the spare shift) testified that when he was not needed as a fill-in SOS on one of the shifts, he would be given a list by the day shift superintendent, who would say,

" 'Well, these are the jobs we've got to get done, so why don't you take so-and-so and so-and-so and go out and show them what you want done and get it done.' "

The personnel Hanson would direct were AO's and CRO's who were spare for that week.[10] (Mr. Paine earlier indicated that

the type of jobs such as a spare crew would do, working under the direction of the spare SOS or shift supervisor, might be to test pieces of equipment such as the emergency diesel generator, or to drum radioactive waste for shipment.)

The other SOS witness called by the Union, Mr. Hanley, was asked to explain the difference between an SOS and CRO, and responded as follows:

"A. Well, basically the shift operating supervisor [SOS] has responsibility in the control room. If there is any question, a decision is made by the shift operating supervisor.

Q. What kind of question are you speaking of?

A. If you are going to start up water treatment, we both know when water treatment is going to need to be put on, so we call the auxiliary operator and have him put it on.

Q. One or the other of you?

A. Either one of us could do that. I am responsible to see that it gets done, to see that it gets put on. If it doesn't get put on, or something that needed doing wasn't put on [sic].

Q. You have the responsibility, the ultimate responsibility, and I suppose beyond you the plant shift superintendent and the operations' department then has?

A. Right."

Mr. Hanley testified that when major systems were to be taken out of service for repairs, higher authority would notify him and he would write out a so-called tagging order. He would also, however, tag minor systems on his own initiative if maintenance were needed on them. With respect to various systems, for example, waste dis-

---

10. Hanson indicated that CRO's and AO's often performed regular assignments without specific directions. In the earlier era, when he was a CRO, he was "directly under the supervisory control room operator." Asked if the latter was considered to be his boss, he responded, "Yes and no," indicating that at that time the shifts worked together to ensure the efficient operation of the plant. There was much talking over of matters between members of the shift. But if it came down to a decision, "the supervisory control room operator made the decision." Hanson further testified that if a CRO was doing something in the "gray area" of procedures, he, as SOS, would have the CRO do it his (Hanson's) way unless the CRO could convince Hanson to do it another way. Hanson was clear, as were all witnesses, that as SOS he had the final say, subject, of course, to the supervening authority of the plant shift superintendent.

posal, he would direct the AO by telephone when to put them on.

The only other SOS to testify, Mr. Blackmore, a Company witness, said the SOS directed the AO's work in the plant, and also directed the CRO's as to "things that would come up that weren't routine things, things like changing equipment." As an added responsibility, the SOS had to make sure that "all of the stuff we have to do during the course of a shift gets done, because we are responsible." Thus in a night shift, there is a great deal of routine surveillance required to be done by the CRO, and it is Blackmore's policy, as SOS, to "get it over as quickly as possible, because you never know what is going to happen over there. And if something happens at 5 o'clock in the morning and you don't have your surveillance done, most likely you are not going to get it done." To accomplish this, there were times he had to get "this guy [CRO] on the stick," though "generally, it [the warning] doesn't have to be too severe." Blackmore testified that he had to tell new AO's "in quite strong terms what they did, that was wrong. . . ." Asked to explain the difference between a CRO telling an AO what to do, and an SOS telling an AO what to do, Blackmore testified that the CRO doesn't have much recourse, except to tell the SOS, if the AO disagrees or just doesn't want to perform assigned tasks. Blackmore felt that he, as SOS, had "avenues to reprimand the guy, or start some disciplinary action against him." He indicated that on occasion, because of his own experience, he was allowed by the plant shift supervisor to leave the control room and oversee certain work being done by an AO out in the plant.

Besides the above testimony, there was other evidence on the issue of the SOS's authority. All SOS's are obliged by the Company to acquire a Senior Operator's license from the Nuclear Regulatory Commission. NRC regulations define a Senior Operator as one designated by a facility licensee (*i. e.,* the Company) to "direct the licensed activities of licensed operators," and the terms of the Senior Operator's license authorize its holder "to direct the licensed activities of licensed operators." A CRO is such a "licensed operator." At the time of the hearing, all SOS's except one held a Senior Operator's license, and the lone SOS then without such a license was about to take the necessary examination.

On the subject of the SOS's authority to direct other employees, the Company's current job description, dated March 24, 1978, provides that the SOS is, "To be directly in charge of plant operating personnel assigned to his shift." (Such personnel are, of course, the CRO and two AO's.) That description goes on expressly to confer upon the SOS the power to exercise authority to shut down the reactor when he determines that safety so requires, and to exercise the plant shift superintendent's authority in his absence. The SOS is to be thoroughly familiar with the Station Operating License, Technical Specifications, and all other applicable regulations. He is to direct completion of records, reports and logs required to be maintained on his shift. If there is a plant trip or power reduction, he is to analyze the cause and recommend to the plant shift superintendent, before startup, that station operation can proceed. He is also to evaluate the performance of operating personnel assigned to his shift; provide recommendations relative to hiring, firing, promotion and other actions affecting personnel;[11] and fulfill other responsibilities "common to all supervisory positions."

The above job descriptions superseded a somewhat comparable one operative (for the earlier-named position of "Supervisory Control Room Operator") since the early

---

11. As indicated below, there is ample evidentiary support for the Board's finding that hiring, firing, promotion and other personnel actions of a like nature are not matters with which, in fact, the SOS's have, to any important degree, been concerned. *See (g) infra.* Since 1978, however, the SOS's have been asked to fill in evaluation forms concerning the CRO and AO's in their shift. As there has been scant turnover or disciplinary action in the small Operations Department, there is little evidence bearing on how effective the SOS's input on such matters will be.

70's when Maine Yankee first began operations. The old job description did not, in so many words, provide that the SOS was directly in charge of shift personnel but did provide that the supervisory control room operator was to "Supervise and approve safe and proper operation of the main control room on his appointed shift throughout all conditions of startup, power generation, shutdown, and emergency." He was to "remain in the main control room . . . to provide direction for returning the plant to power operation following a trip [shutoff] or unscheduled power reduction." Other listed duties were similar to those in the current job description; he was to fulfill "other responsibilities common to all supervisory positions." As already noted, the position was regarded as outside the bargaining unit.

Since the new job description was introduced, certain changes have taken place in the powers and duties of the position. In conformity with the new description, SOS's have been required to fill out evaluation forms for CRO's and AO's on their shifts. Witnesses agreed that it was easy to evaluate CRO's, since SOS's worked with them in the control room, but differed as to whether meaningful evaluation could be afforded with respect to AO's. Union witnesses complained they were limited to second-hand knowledge gained from talks with the plant shift superintendent and on perceptions as to whether, when they asked the AO's to do something, it got done. Company witnesses emphasized that the latter was a reliable index, since if directions were not followed, the ill-effects would soon register in the control room.

Also in conformity with a new job description, SOS's have taken over the shift supervisor's duty of maintaining the plant operations log, a permanent operational record which is passed on to the incoming shift and is deemed to be of primary importance in informing the new shift what has earlier transpired. The more routine record and log-keeping duties together with most surveillance duties have been transferred to the CRO, under the SOS's supervision. SOS's now are also responsible for issuing all tagging orders (i. e., to remove a component from service), and for signing all radiation work permits, which must be issued before personnel work in areas subject to radiation. Otherwise the SOS's continue, as has always been the case, to be in charge of the control room and its related operations involving assistance by the AO's.

f. *Degree of Responsibility and Independent Judgment Exercised by SOS*

In denying supervisory status to the SOS, the Acting Regional Director and Board stressed the supposedly "routine and repetitive" nature of control room work. The Acting Regional Director noted (correctly) that when major systems are scheduled to be taken out or repaired this is "usually initiated or planned aforehand by a Plant Shift Superintendent or Department Head." And in emergencies, "While the SOS can make certain on-the-spot decisions as to which operational procedure to follow, most of these matters are brought to the immediate attention of the Plant Shift Superintendent." Indicative of the "routine" character of the work was said to be the fact that most work functions, including systems take outs, were "closely governed by NRC regulations or the Company's own written procedures."

In making these and similar findings, the Board omitted reference to certain facts which we think are important as shedding light on the amount of responsibility borne by an SOS.

First, the Board made no reference to the serious consequences that can flow from even simple errors made in connection with the operation of a nuclear electrical generating plant. Mr. Paine testified that a mistake by an operator—the throwing of a wrong switch, for example—could cause serious damage to the plant, and might cause a "trip." The plant manager, Mr. Wood, testified that it cost the Company $13,000 to $14,000 per hour whenever there was a trip. Mr. Paine said that a trip would be the "worst case," but since the Three Mile Island episode, it is apparent that far worse

can happen than that as a result of operators' errors. *See Report of the President's Commission on the Accident at Three Mile Island,* October 1979, Washington, D.C. Clearly there are serious dangers associated with operators' errors and this is of relevance when assessing just how responsible a task it is to be in charge of the Maine Yankee control room.[12]

A second omission by the Board was its failure to describe in any depth the nature of the tasks performed by shift personnel for which the SOS is ultimately responsible. The Board dismissed the control room work as routine and repetitive, but made little by way of the subsidiary findings on which it based these conclusions. We do not find substantial evidence in the record to support this characterization. There is evidence, for example, that in starting up the whole plant after a "trip," both the SOS and CRO and at least one AO, are all required to work together at the controls. Dozens of complex systems must at this time be placed in service in synchronization under the vigilant eyes of the SOS. The record contains many other examples of tasks involving systems take-outs and start-ups, that clearly require carefully coordinated, precise, skilled action by several operators.[13] None of these operations, as described in the record, sound to us particularly

simple or relaxed, nor is there any meaningful expert evidence that this is so. Nor can it be said that there is no need for supervision by an SOS. The SOS is in charge of orchestrating the efforts of the CRO, AO's and himself on all such occasions, as well as keeping an eye out for mistakes and responding to sudden malfunctions. While all the operators are somewhat similarly trained, with the SOS being, however, the more experienced, the need that they perform as a team makes it desirable and perhaps often essential that someone be in charge to call the shots. Supervision would also seem important, from the Company's perspective, to catch possible errors. An example of the latter need is suggested by the following incident: it was testified that an AO, misconstruing instructions from the SOS, placed "tags" on a heat exchanger, resulting in its being taken out of service, but neglected first to put a back-up unit in service. The SOS detected the problem when a sudden temperature rise was observed on a control room gauge, and took prompt remedial measures.

The Board not only did not mention incidents and tasks of this nature in determining whether or not the SOS's responsibilities were purely routine, but paid no apparent heed to the fact that on holiday and night shifts responsibility for the entire nu-

---

12. Guarding against human error in high-technology operations by those controlling complex, semi-automated machines has become a matter of serious general concern. Even highly trained people are not error free when required to perform precise tasks over long periods. As, moreover, true emergencies may be infrequent, there is danger not only of simple error but that when a crisis arises the operator will not be geared up to cope—he may be unable to recall precisely what to do. *See* "Human Error: The Stakes Are Raised," Science News, Feb. 23, 1980, Vol. 117, No. 8. The Board here seems to have assumed, simplistically, that once control room personnel are minimally trained and given written instructions (no matter how many) they will perform, thereafter, with little supervision, in a robot-like, error free manner; and that such work is, therefore, to be considered purely "routine" even though the most serious consequences may attend mistakes.

13. SOS Blackmore described, as one of a number of different operations, how if the bearing temperature rises in the charging pump, the

SOS would direct the AO with respect to shutting off the A pump and lining up the S pump, and would also instruct the CRO with respect to taking complementary control room actions. The Hearing Officer broke in to interrogate the witness as to whether the particular proceeding was a "written thing," concluding,

> "HEARING OFFICER: So, if there is a problem, someone goes to a file card and takes it out and reads what do you do when such and such a thing happens?
> THE WITNESS: Right."

The Board has since made much of this piece of testimony and the fact that many operations are written down, apparently to show that the operators are merely mindless automatons. Nowhere did the Board refer to Mr. Paine's testimony that all procedures were not written down, nor to the sheer volume of different operations, some of them obviously quite complex, revealed by the evidence as being within the operators' province.

clear plant is entrusted to the five-member operations shift. During these times, it is neither feasible nor desirable for the chief of the shift, the plant shift superintendent, to be tied to the control room. At least half the time his duties take him to some other place in the extensive six-building plant area, perhaps to talk to a security guard or inspect a piece of machinery. When actions need to be taken from the control room, the SOS is there to organize and direct them. Like the watch officer of a vessel underway, the SOS is always on the bridge. The following is an example of an operation conducted from the control room by the SOS while the plant shift superintendent was necessarily elsewhere: SOS Blackmore testified that on one occasion the bottom had fallen off the heat exchanger in the let-down system, causing a very serious leakage of steam to occur. The plant shift superintendent promptly went to the problem area, a shielded area to which access was difficult, in order to ascertain the nature of the problem. When he found out what was wrong, he contacted the SOS by phone and told him "to initiate a procedure for shutting down that let down, going on alternate let down and charging." The SOS thereupon directed the CRO in the procedure, "because he [the CRO] had never done it before, for one thing, and for another thing it was something that had to be done real fast." The particular procedure was written out; nonetheless, "where he [the CRO] hadn't done it before he was pretty shaky, so I just stood there and made sure he did it okay. . . ." Bearing in mind that we are talking about a nuclear plant, the responsibility of the SOS in that incident does not strike us as particularly routine, nor is it hard to understand why the Company desires an employee of supervisory rank in the control room at such stressful moments.

A third area of the evidence not accurately presented by the Board concerns the SOS's responsibilities in an emergency with respect both to reporting to the plant shift superintendent and taking remedial action in the meantime. The Acting Regional Director was correct, insofar as he went, in finding that most emergency matters are brought to the immediate attention of the plant shift superintendent. The Board, however, was inaccurate in stating "that when unusual occurrences do take place in the plant, *any* deviations from normal operating procedures are cleared with the plant shift superintendent *first*." (Emphasis added.) What the evidence shows is that the SOS is under instructions to contact the plant shift superintendent whenever any event out of the ordinary occurs. However, what the SOS does in the interim, between the time the emergency occurs and the views of the superintendent are obtained, depends on the nature of the emergency and the length of time it takes to reach the superintendent, who may be somewhere out in the plant. The evidence is uncontradicted, as Mr. Paine testified, that in the event of an emergency requiring "something to be done from 10 seconds to 10 minutes, he [the SOS] would do it or direct it to the auxiliary operations or control room operator." There is simply no evidence that if immediate action is required, the SOS must await clearance from the plant shift superintendent before acting. One could imagine situations where to so wait would be to permit a relatively simple problem to escalate into a real emergency. If, for example, a cooling system were malfunctioning, the SOS would undoubtedly consider placing an alternate system into operation without delay. No Company regulation prescribes procrastination in such circumstances. SOS Blackmore testified that he cleared with the superintendent "if he's available. Otherwise, I just have to use my own judgment." He further testified the superintendent might not be available, on occasion, because,

"He might be out in some part of the plant where he couldn't hear me if I called him on the phone. He might be in the head and couldn't come out. He might be outside and just couldn't get to a phone in time for me. I can't hang around the phone all day long. . . ."

While emergency situations of this sort are doubtless few and far between and while

consultation between the SOS and shift operating superintendent is the rule, the evidence remains that the SOS's responsibility includes responding correctly, and on his own, to any emergency where prior consultation is not feasible. And after reaching the superintendent, the SOS's responsibilities do not cease. He remains in charge of the control room. While the particular means of responding to the emergency may be discussed with the superintendent, the latter will have to depend on the SOS for a quick description of the problem and the SOS will be in charge of implementing whatever decision is reached by issuing necessary instructions to the SOS and AO's.

### g. *SOS's Powers To Hire, Fire, Suspend, Reprimand and Evaluate*

The evidence is clear that the head of the operations department, Mr. Paine, does all hiring, although occasionally SOS's have been informally invited to sit in on initial interviews, and one SOS, Blackmore, testified to having had some input into a hiring decision. Suspensions and discharges are also the province of higher management, subject to the collective bargaining contract which covers CRO's and AO's. Mr. Paine indicated that with respect to promoting a CRO to an SOS, he would obtain and consider the recommendations of the SOS on the CRO's shift. Promotions of AO's to CRO are matters governed exclusively by the terms of the collective bargaining contract. In any case, because they are divided into shifts, SOS's would seem to be poorly situated to make comparative judgments for purposes of departmental promotions. Personnel issues such as vacations, leaves, sickness and the like are outside their province, and are handled by the department head.

Since early in 1978 SOS's have been furnished every six months with evaluation forms and asked to fill them out regarding the CRO and AO's on their shift. This practice conforms to the most recent job description, which requires an SOS to evaluate personnel assigned to his shift. Hanson, who is a spare SOS without regular assignment to any one shift, was the only SOS who testified he had not been asked to evaluate anyone. Company witnesses indicated the evaluations would be given significant weight, but there was little concrete evidence in this regard. (Turnover of personnel that might be affected, and the number of personnel problems that might give rise to reliance upon the evaluations, seem to have been very small indeed, if not zero, in the period before the hearing.)

The head of the operations department testified that SOS's "can reprimand at any time." This testimony is not contradicted except to the extent that one of the SOS's distinguished between telling a CRO "to shape up," which he felt he could do, and a formal disciplinary reprimand, which he felt was outside his power. Discipline beyond a reprimand would have to emanate from superiors, and would also have to be processed through Union contract procedures.

### III.

We have marshalled the facts extensively in the preceding section since the details of the SOS's functions are critical in ascertaining whether he is a supervisor as that term is defined in the National Labor Relations Act. We regret to say that we believe the Board both oversimplified and underestimated the responsibilities inherent in this position.

Before coming to the specifics of our conclusion that the Board's findings of non-supervisory status are not supported by the record, we turn briefly to the governing law in this area. Section 2(11) of the Act, 29 U.S.C. § 152(11), defines "supervisory" as follows,

"[A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

■ By well-settled construction, this section is to be read in the disjunctive, with the existence of any one of the statutory powers sufficient to confer supervisory status regardless of the frequency of its exercise. *NLRB v. Magnesium Casting Co.*, 427 F.2d 114, 117 (1st Cir. 1970), aff'd, 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 735 (1971); *NLRB v. Quincy Steel Casting Co.*, 200 F.2d 293, 295 (1st Cir. 1952).

■ It is true that a reviewing court should pay substantial deference to the Board's "special function of applying the general provisions of the Act to the complexities of industrial life." *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963), and that the Board's supported analysis of the facts is entitled to great weight. *NLRB v. Metropolitan Petroleum Co.*, 506 F.2d 616, 618 (1st Cir. 1974); *Stop and Shop Companies, Inc. v. NLRB*, 548 F.2d 17, 18 (1st Cir. 1977). Still, in order to be upheld on review, the Board's determination must be supported by "substantial evidence," and that "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). The Board thus may not distort the fair import of the record by ignoring whole segments of the uncontroverted evidence; for *"It would seem that the purpose of the 'whole record' test is to limit the opportunity for transmuting a preconception into judgment by picking and choosing what will support that preconception and willfully ignoring whatever weighs against it."* *Jaffe*, Judicial Control of Administrative Action at 607 (1965) (emphasis in original). Similarly, the Board may not rewrite the statutory definition of a supervisor by refusing to apply parts of that definition which do not comport with the Board's private views as to who should be deemed to possess supervisory status.

As already indicated, *see* note 11 and Section II(g), *supra*, we accept as adequately supported the Board's findings that SOS's do not sufficiently possess the power to "hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees," or to "effectively recommend such action." To be sure, the SOS's formal responsibility to evaluate shift personnel suggests the possession of some power to make effective employment recommendations. But the record points to few employment actions where SOS input was a factor. In the two incidents reported culminating in suspension, for example, the miscreant was independently "found out" and dealt with by higher authority, with no critical input from the SOS. This absence of evidence does not necessarily show that an SOS's recommendation will be ignored: the operations department is small and disciplinary incidents and turnover are perhaps infrequent. Still the Board's negative conclusions in regard to the SOS's authority to influence hiring, firing, promotion and the like cannot be rejected as unsupported.

■ Where we part company with the Board, and find its conclusions plainly unsupported, is on the question whether the SOS's have the authority in the interest of the employer "responsibly to direct [other employees] . . . ," such exercise of authority being "not of a merely routine or clerical nature, but requir[ing] the use of independent judgment." On this issue we rely heavily on the factual analysis just set out in Section II, *supra*, in which we have attempted to piece together the evidence so as fairly to depict the SOS's role.

The evidence of record is absolutely overwhelming and uncontroverted—indeed the Acting Regional Director in effect so found—that the SOS has authority to direct the CRO, with whom he works face-to-face in the control room. *See* Section II(e), *supra*. It is likewise utterly clear that as to the placing of systems and components in and out of service, which occupies a substantial part of each AO's time, and other control room directed matters, the SOS has authority to direct the two AO's employed on each shift. This authority of the SOS over the CRO's and AO's is, it may be added, not of recent vintage. It dates back to 1972, the year Maine Yankee first went into operation.

As, therefore, the SOS clearly meets the statutory term that he possess authority to direct other employees, the principal matters remaining to be addressed are simply whether the quality of the SOS's direction can be termed "responsible," and whether his authority to direct meets the statutory requirement that it be "not of a merely routine or clerical nature, but requires the use of independent judgment."

Merely to ask the questions comes close to answering them. "To be responsible is to be answerable for the discharge of a duty or obligation. Responsibility includes judgment, skill, ability, capacity, and integrity, and is implied by power." *Ohio Power Co. v. NLRB*, 176 F.2d 385, 387 (6th Cir.), *cert. denied*, 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553 (1949). We can imagine few more truly responsible jobs than that of the SOS on duty during the back shift at the Maine Yankee nuclear facility.[14] The evidence was clear that the SOS is in overall charge of the plant's nerve center, the control room; and the head of the operations department testified, without contradiction, that should anything go wrong with respect to the plant's electric power output, "he's the one that would have to answer why." That the SOS is thus "directly responsible for the performance of [his] department," and is "held fully accountable and responsible for the performance and work product of the [employees] in his department," *NLRB v. Fullerton Publishing Co.*, 283 F.2d 545, 550 (9th Cir. 1960), coupled with other evidence of his authority to direct those employees in the performance of myriad complex tasks, points unmistakably to the conclusion that the SOS is clothed with supervisory power.[15] The SOS's duties include ensuring that numerous gauges are accurately monitored, responding efficiently and appropriately to the many warning signals and alarms should they become activated, and seeing that any one or more of the plant's some 60–70 systems are properly placed in and out of service on the many occasions when that is necessary. These tasks at times involve his coordinating the efforts of the three other operators and making decisions among them as to the correct action to take whenever there is any question. And, while the Maine Yankee facility is semi-automated and there are many safety back-ups, the possibility of operator error is not merely theoretical, *see* note 14, *supra*; such error could cause damage to the plant, and on a rare, but we cannot say impossible occasion, could wreak havoc in the surrounding countryside. We are at a loss to see how such grave responsibility can be swept aside as routine and clerical.

Supervisory authority would, of course, be lacking here if the SOS did "little more

14. This responsibility is, in fact, of a unique nature and magnitude. The potentially devastating effects on the surrounding area and on the Company's facility which might follow an erroneous action by the SOS are rather self-evident; and as recent events show, the possibility of such error is not unimaginable. The Report of the President's Commission on the Accident at Three Mile Island concludes that the incident there reflected, at least in part, the fact that operating personnel "made some improper decisions, took improper actions, and failed to take some correct actions." *Id.*, at 27. The Commission recommends better training and higher educational requirements for operators—a recommendation surely at variance with any notion that their responsibilities are minor and routine. On the reverse side of the coin, it may have been an operator's use of responsible independent judgment, according to newspaper reports, which averted a mishap at the nuclear power plant at Crystal River, Florida. *See* The Boston Globe, March 5, 1980.

15. To be sure, one of the SOS's testified that while he had authority "to watch over the control room operator . . . I don't really watch over him either because I know that he knows what he is doing." This statement was made in the context of attempting to explain that the plant shift superintendent "is not going to come in and go over and start looking at the control board where the CRO is sitting and try to find something wrong . . . It's not his job. I am responsible for the control room." We find nothing in this testimony, when read in context and as a whole, to suggest that the SOS felt he lacked authority over and ultimate responsibility for the CRO's actions. He was merely indicating that good administration dictated that each person in the chain of command display a proper regard for a subordinate's demonstrated competence and sphere of responsibility.

than [himself] supervise the use of sophisticated machines." *Arizona Public Service Co. v. NLRB*, 453 F.2d 228, 231 (9th Cir. 1971) (reversing Board Order and Decision finding lack of supervisory power). He must have the power to direct other employees. But here the evidence is clear that in fulfilling his overall responsibility over control room functions, the SOS is empowered to direct, and whenever necessary does direct, the CRO and AO's assigned to a particular shift. The Board's attempt, moreover, to equate this case with cases where any authority shown to exist simply reflected "a more skilled employee advising one less skilled" and the fact that it is not unusual for the most skilled individual within a small group to command respect, although possessing no supervisory powers, *see NLRB v. Magnesium Casting, supra*, 427 F.2d at 118, is entirely misplaced. The granting of express authority to direct others could not be clearer, as is the evidence that such Company-conferred authority is recognized and accepted by all concerned—including the two witnesses called by the Union itself. That the SOS may spend a good deal of his time performing tasks similar to those assigned to the CRO is not, as the Board urges, of great weight. *Cf. NLRB v. Leland-Gifford Co.*, 200 F.2d 620, 626 (1st Cir. 1952) ("The evidence is that those who retained other men in their respective departments were expected to and did supervise those men, even though supervision did not take much of their time, with the result that most of their time was spent in routine production work"). It is the existence of supervisory authority which is critical. And that authority, which plainly exists here, is not "less [so] because it is couched in non-demanding terms." *Arizona Public Service Co. v. NLRB, supra*, 453 F.2d at 233.

The Board's finding that the SOS's failed to possess supervisory authority was anchored to a great extent in its conclusion that the control room maintenance and monitoring tasks performed and overseen by the SOS were of a "routine and repetitious" nature, involving little use of independent judgment. This lack of independent judgment, the Board reasoned, was emphasized by the fact that the procedures falling within the purview of the SOS's responsibility are governed to a great extent by Nuclear Regulatory Commission guidelines and Maine Yankee's own written procedures manual. Thus, the Board concluded that any direction the SOS might give to the CRO and AO's as to the performance of their duties was so circumscribed by the pre-established written operating procedures as to cause such direction to be effectuated without any exercise of independent judgment.

The Sixth Circuit rejected an identical argument in a similar context, *see NLRB v. Detroit Edison*, 537 F.2d 239 (6th Cir. 1976), and we likewise find the approach unpersuasive here. First, the record strongly suggests that written operating procedures do not "exist for every possible contingency which the [SOS] may face." *Detroit Edison, supra*, 537 F.2d at 243. The operations department head, Mr. Paine, testified that while many procedures were covered by written instructions,

"they don't all conform, by any means, to components throughout the plant. That is, there's a lot of systems that will be covered by procedures; but there's many more that are not covered by procedures. Q. So that it would be [the SOS's] judgment in those situations. A. Yes." [16]

And further, even were we to assume that written guidelines could somewhere be found to cover virtually every eventuality, we do not think that this would demonstrate that independent judgment is not exercised by an SOS in directing the CRO and AO's in the performance of their re-

---

16. Certain testimony of SOS Blackmore can be read to suggest his agreement with the broad proposition that all emergency instructions are written down. These remarks arose during a discussion of other issues; we do not think, in context, they amount to a reasonable basis for rejecting the testimony of the head of the operations department, Mr. Paine, that not all matters are covered by written procedures.

quired tasks. In overseeing the means whereby the 60–70 separately controlled systems that comprise the generating plant are placed in or out of operation, the SOS is obviously confronted with an immense number of options and procedures. *Accord, Detroit Edison, supra,* at 244. Examples in the evidence make it abundantly clear that these are not exercised by merely punching a button or two. Different procedures are required as to different systems, and considerable training and expertise is plainly required (as shown, for example, by the subjects on which operators are examined to obtain the necessary NRC licenses). This complexity is increased by the fact that any occasional errors committed by control room personnel must be rectified by prompt resort to the proper corrective procedures. The Board's rather simplistic view of the relationship between the SOS and his operations staff ignores the role of the SOS in orchestrating and coordinating the many actions—routine and otherwise—entailed in his shift's efficient, safe and uninterrupted operation of the nuclear plant. We fail to see how selecting the correct operating procedures, whether written or not, governing such a vast array of instruments and equipment in all possible permutations of emergency and more routine situations, directing the other employees in the performance of the procedures so selected, and coordinating all their efforts in a unified scheme of operation, can be said not to depend upon an exercise of independent judgment. That judgment is hopefully informed by strict training and written procedures, but it is judgment nonetheless; it is not simply the conditioned reflex of an automaton.

The SOS's responsibility is not comparable, as the Board might have us believe, to that of a dispatcher who assigns employees and equipment according to a relatively simple pre-programmed plan that is developed by the employer and from which the dispatcher has no authority to deviate. *See Pacific Intermountain Express Co. v. NLRB,* 412 F.2d 1, 2 (10th Cir. 1969). *Cf. NLRB v. City Yellow Cab Co.,* 344 F.2d 575, 581 (6th Cir. 1965) (operators relaying customer requests for service received by tele-phone to drivers in the field). *Compare NLRB v. Metropolitan Petroleum Co. of Massachusetts, Etc.,* 506 F.2d 616 (1st Cir. 1974) (finding, contrary to the Board, supervisory status for dispatcher who exercised "judgmental direction of men in the field" in carrying out his responsibility for planning each day's deliveries). The Board's view of the SOS as a sort of conduit relaying preestablished instructions for each routine task and all contingencies to fellow workers with no use of discretion or judgment is not supported by the evidence of record. The SOS's undisputed responsibility over the control room, his undisputed authority to direct the performance of the CRO and AO's, and the undisputed complexity, variety and general character of the operations work and procedures renders inapposite any comparison between this case and the dispatcher situation.

There is considerable evidence of the SOS's supervisory status which the Board either ignored completely or downplayed to an unjustified extent. *Cf. NLRB v. A. Sartorius & Co.,* 140 F.2d 203, 205 (2d Cir. 1944). Importantly, the uncontroverted evidence established that in the event of an emergency the SOS's clear responsibility includes the taking, on his own initiative, of the proper corrective measures where prior consultation with the plant shift superintendent is not possible. Rather than accepting this circumstance, which courts have generally found to be of great weight in determining supervisory status, *Detroit Edison, supra,* 537 F.2d at 244; *Ohio Power Co., supra,* 176 F.2d at 388, the Board instead emphasized that in most emergency situations the SOS would inform his superior, the plant shift superintendent, as to what had occurred. We, however, agree with the Sixth Circuit's response to a similar argument: "The testimony relied upon by the Board establishes only that the Company, like almost every business, has an established hierarchial structure. It would likely be standard procedure in most businesses for lower level supervisory personnel to keep superiors informed during emergency situations." *Detroit Edison, supra,* 537

F.2d at 244.[17] And as in that case, the record here "contains no evidence to support the conclusion that the job of the [SOS] is taken over by higher Company officials during the emergency . . .." *Id.* That the SOS prudently informs a superior of an unexpected circumstance, and that he is expected to do so, does not lead to the conclusion that in the event of such a contingency the SOS is somehow stripped of his authority and duty to act. As indicated in Section II(f), *supra*, the evidence is clear that the SOS would be expected to do on his own whatever is appropriate pending his being able to reach the plant shift superintendent; and thereafter he may well have to continue to direct operations on his own from the control room while the superintendent investigates the problems out in the plant area. Nor is the infrequency and hopeful likelihood of an emergency any basis for ignoring evidence of the SOS's authority over the operations crew during such a situation. "The fact that an emergency is not always in existence is immaterial . . .." *Ohio Power, supra,* 176 F.2d at 388. It is the existence of the statutory power, here undisputed, that is crucial. *Magnesium Casting, supra,* 427 F.2d at 117. The fact that Maine Yankee's equipment and its personnel may have fortunately performed in such a manner, as of the hearing date, so that SOS's have not been called upon to exercise their latent emergency authority should hardly provide reason to support a denial that the authority in fact exists, or the conclusion that the existence of such power is an inadequate indication of supervisory status.

In reviewing the Board's conclusions, it is disquieting that the Board refused to attach any weight whatever to the Company's own job description of the position in issue. The description provides that the SOS is directly in charge of plant operating personnel assigned to his shift, and details certain supervisory type powers. Presented with the job descriptions covering the many positions initially in dispute, including that of the

SOS, the Acting Regional Director simply rejected, in blanket fashion and with no independent analysis of each separate position, the evidentiary impact of all such descriptions. The Director said that the record did not "adequately indicate whether some or all these employees" were advised in any way of the authority granted by the new descriptions, and further that, at any rate, the descriptions were insufficient by themselves to establish the existence of actual supervisory power. We agree that job descriptions standing alone and unsupported by other evidence would, no doubt, indicate little; but the Director's refusal to consider at all the job description of the SOS, whatever might have been appropriate as to the other positions in question, is not justified in light of the variety of evidence indicating that it fairly depicted the SOS's responsibilities. This is not a case, as the Director apparently concluded, similar to *Southern Bleachery and Print Works, Inc.,* 115 NLRB 787, 788 (1956), where the Board found that while a new job description "purported" to confer supervisory authority on a particular class of workers, in fact the employer had "effectuated no material changes in [those employees'] functions." While the Board certainly would be entitled to ignore those parts of an employer job description of a patently self-serving nature—which grant an employee responsibility on paper which in fact he did not possess—the evidence here does not indicate any significant divergence between the SOS's real powers, and those listed by the Company. An earlier job description was in major respects very similar; and the changes in duties made in 1978 and embodied in the current description were all shown to have been implemented except, arguably, in the area concerning effective recommendations as to hiring, firing and promotions. *Compare* Section II(g), *supra.* Even if the Company were partly motivated to make these changes by a desire to fortify the SOS's supervisory status, it was entitled

---

**17.** The desirability of keeping higher authorities fully advised is particularly obvious in the circumstances of a nuclear plant where the consequences of an accident could be so serious.

to make them so long as they were not bogus but were in fact carried out in good faith. It is the Company, not the Board, that defines the jobs in its own hierarchy. *See West Penn. Power Co. v. NLRB*, 337 F.2d 993, 997 (3d Cir. 1964). That the Company grants supervisory authority to these SOS's is a factor that the Board cannot simply ignore. *See Arizona Public Service Co. v. NLRB, supra*, 453 F.2d at 231.[18]

Indeed, in addition to ignoring the Company's representations contained the job description as to the SOS's supervisory capabilities, the Acting Regional Director further ignored legitimate Company considerations by concluding that "to find the SOS's to be supervisors would create an unrealistic supervisor ratio both on the day shift as well as on the other shifts." We think that as a general proposition a determination of the proper number of supervisory personnel required to adequately carry out an employer's needs and policies is a matter for that employer, not one for the Board. Perhaps if it were demonstrated that alleged supervisory authority was merely duplicative, and that a purported supervisor had no real authority, but simply parroted the commands of the true supervisor, the Board might be justified in ignoring Company labels and concluding that the Company had stacked the supervisory deck too heavily in its favor. But here the record is clear that the responsibilities of the SOS and his superior, the plant shift superintendent, do not substantially overlap. Considering the tremendous Company investment at stake, we hardly think it unreasonable that the Company would desire to clothe more than one individual in its operations crew with supervisory status. This seems particularly so when it is recalled that the plant shift superintendent spends a great deal of his time making rounds throughout the six buildings comprising the Maine Yankee facility, and that the SOS, then, is left largely alone in his immediate responsibility over the control room and the other shift personnel.

The Company is entitled to ensure that its interests are protected and furthered, *cf.* Section 2(11), *supra*; *NLRB v. Yeshiva University*, —— U.S. ——, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980), by designating what it generally deems an appropriate number of supervisory personnel. Keeping in mind the unique employment context involved, and the separate and distinct supervisory functions of the plant shift superintendent and SOS, Maine Yankee's allotment of that supervisory authority here was certainly neither unreasonable nor pretextual.

We note also that the Board apparently swept aside the fact that the SOS's, in the course of generally overseeing control room operations, direct the CRO's as to the timely completion of surveillance duties, and further, that the SOS's are frequently placed in charge of work crews on so-called spare shifts. The evidence was consistent with indicating that the SOS has authority to direct the varied work of these crews performed throughout the plant. Thus the SOS in control may be instructed by the plant shift superintendent to take a particular crew to the assigned location and "show them what you want done and get it done." Such an "exercise of authority is nonetheless supervisory because it is a delegated authority." *Eastern Greyhound Lines v. NLRB*, 337 F.2d 84 (6th Cir. 1964).

Finally, we note two rather objective indications of the SOS's supervisory status that apparently had little impact on the Board's decisional process: the SOS is salaried at a rate approximately 17 percent higher than the straight time hourly wage received by the CRO, and the SOS's, unlike the CRO's or AO's, are invited to attend so-called management meetings. *See Stop & Shop Companies, supra*, 548 F.2d at 20. While these two occurrences standing alone might not be deemed of critical import, taken together with all the other evidence of the SOS's supervisory role, they are certainly worthy of some attention.

---

18. Similarly, the fact that the SOS's are obliged to acquire an NRC Senior Operator's license authorizing them to "direct" the licensed activities of other operators such as the CRO, is an indication of the existence of supervisory status which together with all the others, cannot be cavalierly dismissed by the Board.

In summary then, without repeating all of the evidence that was summarized at length in the preceding section, we do not see how the Board's negative finding on the issue of the SOS's supervisory authority can possibly be sustained. Although we are well aware of our duty, particularly in close cases, to defer to the Board's expertise in these matters, *Magnesium Casting Co., supra,* 427 F.2d at 117, here we "cannot conscientiously find that the evidence supporting [its] decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Universal Camera Corp., supra,* 340 U.S. at 488, 71 S.Ct. at 464. The responsibilities of the SOS are too important, his duties too complex, and his authority over the CRO and AO's too clearcut to admit of another result.

*Accordingly, the Company's petition for review is granted and the Board's application for enforcement of its order denied.*